UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

BRANDON STOWE,

  *Plaintiff*,

  v.

TOWN OF CHESHIRE, CHESHIRE POLICE TRACY GONZALEZ, in her individual capacity, AND CHESHIRE POLICE OFFICER DEVIN FLOOD, in his individual capacity,

  *Defendants*.

Case No. 3:23cv350 (MPS)

## RULING ON MOTION FOR SUMMARY JUDGMENT

The plaintiff, Brandon Stowe, brings this action under 42 U.S.C. § 1983 against defendants Cheshire police officers Tracy Gonzalez and Devin Flood and the Town of Cheshire, alleging that his arrest on July 18, 2021 for assault, disorderly conduct, and risk of injury to a child, and arrest on June 3, 2022 for violation of a protective order were not supported by probable cause. ECF No. 1. As to each arrest, the complaint asserts claims of false arrest in violation of the Fourth Amendment (counts 1, 4) and intentional infliction of emotional distress (count 2, 5). In addition, Stowe asserts indemnification claims under Conn. Gen. Stat. § 7-465 against the Town of Cheshire for the acts of Officers Gonzalez and Flood (counts 3, 6). The defendants have moved for summary judgment under Fed. R. Civ. P. 56 on all claims. ECF No. 32. For the reasons that follow, the motion for summary judgment is granted as to the federal false arrest claims and the Court declines to exercise supplemental jurisdiction over Stowe's state law claims.

I.   **Factual Background**

  The facts set forth below are taken from the parties' Local Rule 56(a) Statements and

exhibits and are undisputed unless otherwise stated.

Stowe resides on Cornwall Avenue in Cheshire, Connecticut. ECF No. 38-3, Stowe Aff. ¶ 1. He has a son with his girlfriend Ashley Wells. ECF No. 1 ¶ 6. Stowe and Wells have been in a relationship for a number of years. ECF No. 38-10 at 6.

**June 28, 2021 incident between Stowe and Wells**

*Interview of Nicolle Schierferstein*

On July 4, 2021, Nicolle Schieferstein, who worked with Ashley Wells, reported to the Cheshire Police Department and was interviewed by Officer Alexander Wells[1] regarding a domestic incident that occurred on June 28, 2021, between Stowe and Ashley Wells. ECF No. 38-1 ¶¶ 1-2. In a recorded statement, Schieferstein told Officer Wells that her friend and co-worker, Ashley Wells, was in a "pretty bad relationship" with her boyfriend, Stowe, with whom she lives in a house on Cornwall Avenue in Cheshire. ECF No. 38-8 at 3, 8.

Schieferstein reported that late in the evening on June 28, 2021, she received a call from Ashley Wells through Wells's daughter's Instagram account. ECF No. 38-1 ¶ 3. Wells said that she and Stowe had gotten into a "big fight." ECF No. 38-8 at 17. At the time, Stowe and Wells were at home in Cheshire with their son, Stowe's daughter, and Wells's daughter. ECF No. 38-2, Stowe Aff. ¶ 5.

Schieferstein stated that Wells told her that Stowe had grabbed her phone to look at her messages and "she was trying to get it back." ECF No. 38-8 at 4, 19. Schieferstein wasn't sure "what happened in the actual fighting part, like what exactly happened," but Schieferstein said that Stowe was screaming, the kids were screaming, Stowe had scratches on him, and Stowe had

---

[1] The plaintiff refers to Officer Wells as David Wells whereas the defendant refers to the officer as Officer Alexander Wells, compare ECF No. 38 at 3 n.1 with ECF No. 32 at 8, and offers the affidavit and case/incident report of Officer Alexander Wells. ECF Nos. 32-2, 32-4. In any event, Officer Wells is not related to Ashley Wells. ECF No. 38 at 3 n. 1.

thrown Wells through a door. *Id.* at 5, 19. The children were upset. *Id.* at 20. Stowe left the house with Ashley Wells's cell phone. *Id.* at 22. He later returned to the house and gave Wells the phone. *Id.* at 24. Wells went to Schieferstein's house. *Id.* at 25. Schieferstein saw bruises and scratches on Wells's arms and took photos of them, which she forwarded to Officer Wells. *Id.* at 22, 23, 31.

Schieferstein told Officer Wells that, the next day, while Schieferstein was present, Ashley Wells had a phone conversation with Stowe in which she was crying, and Stowe was threatening to speak to an attorney about custody of their son. *Id*. at 25. That same day, Wells and Stowe left for a trip to Disney with their children. ECF No. 38-1 ¶ 12.

Schieferstein further stated that Hayden Beausoleil, a man whom Wells had been texting, was "the one that like initiated talking to you guys." ECF No. 38-8 at 29. Officer Wells told Schierferstein that the investigation would continue, *id.* at 33, and completed a case/incident report. ECF No. 32-4.

*Interview of Ashley Wells*

Upon her return from Florida on July 6, 2021, Ashley Wells stayed in a hotel room in Wallingford. ECF No. 38-1 ¶ 13. She spoke with Officer Gonzalez in the hallway outside of the hotel room about the June 28, 2021, incident that Nicolle Schieferstein had reported to the Cheshire Police Department. *Id. ¶* 14. The interview was recorded on Officer Gonzalez's body worn camera. *Id.* ¶ 15. Wells stated that she was at the hotel because "I didn't want to go home [to] [Stowe].... I just want to like let him cool off." ECF No. 38-10 at 31. As to the June incident, she stated that she and Stowe "had a really bad, like physical altercation and like, he hurt me, and I scratched him," *id.* at 6, and that the "fight that night" "started" when their son told Stowe that Wells was "on the phone with [her] boyfriend." *Id.* at 9. Wells said that although

Stowe initially left the house after the altercation, he later returned and he said, "I was just pushing you off of me because you were trying to get the phone from me. That's why you fell. That's why you got hurt." *Id.* at 24. Wells said her son saw the fight and "he was like hysterical." *Id.* at 24. She asked if she would be arrested. *Id.* at 17. According to Wells, after the incident, Stowe threatened to send out "naked pictures and stuff . . . to my mom and stuff like that." *Id.* at 7. She said that she is "scared" of him, *id.* at 14, and that during their Disney vacation, "[h]e punched me so hard he scarred his knuckle." *Id.* at 15.

Wells told Officer Gonzalez that "I'm just – just having a hard time because I've been here like eight years. And he hasn't been like physical for like – he was really bad for like the first two years and then it kind of like died off." *Id.* at 3. Wells gave some history about her relationship, including that Stowe didn't allow her to do certain things, had told her she couldn't talk to a friend because she was a lesbian, had turned off her phone, and didn't want her to go to her job. *Id.* at 7, 13, 25, 27, 28.

Officer Gonzalez told her that with domestic violence, "we get to determine who we think the dominant aggressor is. So, you're saying self-defense, he went after you because he didn't like who you were talking to on the phone. He took your phone away from you. He was the dominant aggressor. So we're going to do the warrant for him." *Id.* at 33. Wells declined to give a written statement. *Id.* at 15.

*Stowe's Version*

Gonzalez did not interview Stowe. According to Stowe's version of events, he became aware of messages on Wells's phone from another man. ECF No. 38-5, Stowe Dep. at 9-10. Wells hit him in an effort to take the phone from him and he "grabbed her by the arm and [] pushed her back. . . . [S]he stumbled backwards and she fell into the door. She was not thrown

4

through a door or pushed through a door. I was simply trying to retreat and put some distance between us so I could escape." *Id.* at 11, 13. According to Stowe, Wells "may have had a bruise on her arm from when I had pulled her off me because I did have to use some force to put distance between us." *Id.* at 14. He denied that she was injured. ECF No. 38-3, Stowe Aff. ¶ 10.

*Arrest Warrant Application for Stowe's Arrest*

Officer Gonzalez applied for an arrest warrant for Stowe for assault in the third degree in violation of Conn. Gen. Stat. § 53a-61, risk of injury to children in violation of Conn. Gen. Stat. § 53-21, and disorderly conduct in violation of Conn. Gen. Stat. § 53a-182. The warrant application stated in pertinent part:

> 1. That, on 7/4/21 at 0800 hours, Officer Wells met with Nicole Schieferstein, who stated she wanted to report a domestic violence incident between her coworker and friend, Victim 1, and Victim 1's boyfriend, Brandon Stowe, that occurred on June 28, 2021 at 2300 hours at their home located [on] Cornwall Avenue in Cheshire. Schieferstein stated that Stowe threw Victim 1 through a door, causing injuries. Schieferstein forwarded photos of Victim 1's injuries to Officer Wells; bruises on her left arm and lower back and scratches on her right arm. On July 5, 2021 at 1002 hours, Officer Wassil also took a complaint from Schieferstein about a separate domestic violence incident that occurred on July 3, 2021 between Victim 1 and Stowe at a Walt Disney Resort in Orlando, Florida. Schieferstein stated that Stowe punched Victim 1 in the head. The punch caused lacerations to Stowe's fist.
>
> 2. That, on 7/6/2021 at 1930 hours, this Affiant made contact with Victim 1 at a hotel in Wallingford, where she was staying with her son, 6 year old Juvenile 1. Victim 1 chose not to complete a written statement, but her statements to this Affiant are recorded on Cheshire Police Body Worn Cameras. Victim 1 stated that she and her boyfriend, Stowe, have been in a dating relationship for eight years. They have a minor child together, Juvenile 1. They have lived together for most of those eight years. Victim 1 stated that Stowe found out she was cheating on him and took her phone to look at the text messages between them. When Victim 1 tried to get the phone back from him, a struggle between the two of them ensued. Stowe pushed her through a door. During the struggle, Victim 1 obtained bruises and cuts and Stowe obtained a scratch to the neck. When this Affiant met with Victim 1, she said the bruises and cuts were healed and no longer visible to photograph. Both Juvenile 1 and Victim 1's daughter, Juvenile 2, were present during the incident.

5

> 3. That, Victim 1 told this Affiant about the incident on 7/3/2021 while Victim 1, Stowe, Juvenile 1, and Juvenile 2 were in Disney World in Florida on a family vacation. Stowe became upset with Victim 1 because he was reviewing the text messages he saved between Victim 1 and the man she was having an affair with. Stowe punched Victim 1 on the left side of the head. The strike left lacerations on Stowe's hand where it connected with her head. Victim 1 showed this Affiant where she was struck on the head but stated that it was only "tender" and no injury was visible.
>
> 4. That, during this Affiant's interview with Victim 1, she spoke about the ways in which Stowe has treated her over the past eight years that they've been together. Victim 1 said that when she was pregnant with Juvenile 1, six years ago, he became physically violent with Victim 1, at times kicking her in the stomach. The physically abusive behavior eventually stopped for a few years but recently started back up again. Victim 1 also described that Stowe will not allow her to return to work tomorrow, refusing to care for Juvenile 1 while she is there. Stowe threatens that Victim 1 will never see her children again because he will get full custody and not allow her visitations. Stowe won't allow Victim 1 to work with men, only with women but then told her she couldn't work with women anymore when he learned that one of her co-workers was a bi-sexual or lesbian, and he worried that Victim 1 would become bi-sexual or a lesbian. Victim 1 explained that she has no friends anymore and can only talk to the people she works with at work because she isn't allowed to have friends outside of work. Prior to this Affiant's arrival this evening, Stowe told Victim 1 that he was going to post nude photos of her to social media sites because he became upset about her affair. Stowe has also turned off service to Victim 1's phone for several days and only turned it back on today, leaving her with no way to contact anyone.

ECF No. 32-10.

On July 18, 2021, Stowe was arrested. ECF No. 38-1 ¶ 21.

**Stowe's June 2022 Arrest**

A protective order was issued by the Meriden superior court based on Stowe's arrest for the June 28, 2021 incident. ECF No. 38-1 ¶ 22, ECF No. 32-17. Wells was the protected person in the protective order. ECF No. 38-1 ¶ 27. Her address was listed as Joseph Road in Colchester. ECF No. 32-17. In pertinent part, the protective order required Stowe to "Stay away from the home of the protected person and wherever the protected person shall reside." ECF No. 32-17.

6

On June 3, 2022, Officer Flood was dispatched to Cornwall Avenue in Cheshire after the Cheshire Police Department received an anonymous report that Stowe was violating the protective order. ECF No. 38-1 ¶ 23. Upon arriving at the Cornwall Avenue address, Flood observed Stowe walk out of his home on Cornwall Avenue, get into his car, and exit the driveway. *Id.* ¶ 24. Officer Flood pulled Stowe over. ECF No. 38-9, Stowe Aff. ¶ 34.

According to Officer Flood's case/incident report, Stowe's grandmother, Gladys Stowe, said that Wells resides at the Cornwall Avenue residence. ECF No. 32-15. And Stowe told him that "Wells stays at his residence often as they are boyfriend and girlfriend." *Id*. Officer Flood spoke to Wells on the phone, who also said that she stays at the Cornwall Avenue residence often and that she is allowed to do so. *Id.* She said that the protective order listed her residence as the Joseph Road address in Colchester. *Id.* Wells later arrived in person and said that the call to the police likely was made by Stowe's ex-girlfriend who was jealous of their relationship. *Id.*

According to Stowe, the Superior Court had issued a modified protective order that prohibited Stowe from being at Wells's residence in Colchester, but explicitly allowed her to be at Stowe's Cheshire home to allow for the parenting of their children. ECF No. 38-3, Stowe Aff. ¶ 37. Officer Flood spoke to Stowe's attorneys, Daniel Thibodeau and Martin Minella, who explained this and said that the protective order did not prohibit Stowe from being at his own home with Wells and their children. ECF No. 38-14, Thibodeau Aff. ¶ 7.

Sergeant McClleland contacted the Meriden courthouse, however, and "confirmed that no changes had been made to the protective order and that the current order was still in effect." ECF No. 32-2 ¶ 37; ECF No. 32-15.[2] During the vehicle stop, Officer Flood explained to Stowe

---

[2] In his Local Rule 56(a)2 statement, Stowe denies this statement and cites Thibodeau's affidavit in which he avers that the protective order was modified. ECF No. 38-1 ¶ 37. This evidence does not contradict the truth of the statement that the Cheshire police department contacted the Meriden courthouse and was told that no changes had been made to the protective order.

7

that under the protective order, he was to stay away from "wherever the protected person shall reside" and arrested him for violation of a protective order in violation of Conn. Gen. Stat. § 53a-223.  ECF No. 32-15.

All charges against Stowe were dismissed.  ECF No. 1 ¶¶ 27, 44.

## II. Legal Standard

"Summary judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (internal quotation marks and citations omitted). In reviewing the summary judgment record, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013).  "A genuine dispute of material fact exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013).  The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986).  If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact.... More specifically, it must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (internal quotation marks and citations omitted).  "Where no rational finder of fact could find in favor of the nonmoving party because the evidence to support its case is so slight, summary judgment must be granted." *Id.* (internal quotation marks omitted).

## III. Discussion

The defendants move for summary judgment on the grounds that the plaintiff's arrests were supported by probable cause and even if probable cause was lacking, they are entitled to qualified immunity because they had arguable probable cause.

"The existence of probable cause to arrest—even for a crime other than the one identified by the arresting officer—will defeat a claim of false arrest under the Fourth Amendment." *Figueroa v. Mazza*, 825 F.3d 89, 99 (2d Cir. 2016). "Probable cause to arrest exists when the arresting officer has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (internal quotation marks omitted). "[P]robable cause is a fluid concept ... not readily, or even usefully, reduced to a neat set of legal rules.... While probable cause requires more than a mere suspicion of wrongdoing, ... its focus is on probabilities, not hard certainties.... In assessing probabilities, a judicial officer must look to the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007) (internal quotation marks and citations omitted). "When determining whether probable cause exists courts must consider those facts available to the officer at the time of the arrest and immediately before it." *Caldarola v. Calabrese*, 298 F.3d 156, 162 (2d Cir. 2002).

### A.     July 2021 Arrest

Stowe argues that his July 18, 2021 arrest was not supported by probable cause because the affidavit submitted by Officer Gonzalez in support of the arrest warrant contained false statements and material omissions that, if corrected, vitiate probable cause.

"An arrest pursuant to a facially valid arrest warrant is presumed to be made with probable cause." *Martinetti v. Town of New Hartford*, 12 F. App'x 29, 32 (2d Cir. 2001) (summary order). In order to overcome this presumption, a plaintiff must show the officer who obtained the warrant "knowingly and intentionally, or with reckless disregard for the truth, made a false statement in his affidavit or omitted material information, and that such false or omitted information was necessary to the finding of probable cause." *Kaskel v. Compagnone*, 664 F. App'x 109, 110 (2d Cir. 2016) (summary order) (citing *Soares v. Connecticut*, 8 F.3d 917, 920 (2d Cir. 1993)). To evaluate such a claim, the Court "put[s] aside allegedly false material, suppl[ies] any omitted information, and then determin[es] whether the contents of the 'corrected affidavit' would have supported a finding of probable cause." *Id.* at 110–111.

Stowe asserts that Officer Gonzalez misrepresented that Stowe was the "dominant aggressor," despite statements by Wells and Schieferstein that "Wells had initiated the physical violence." ECF No. 38 at 10.[3] But the arrest warrant affidavit nowhere mentions the phrase "dominant aggressor" or even discusses this legal concept. See note 3, *supra*. Even if it did, such a legal term would be irrelevant to a judge's determination of probable cause. *Rio*, 496 F.3d at 156 ("the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act" are the proper focus of the probable cause inquiry).

---

[3] Officer Gonzalez's and Stowe's reference to "dominant aggressor" appears to refer to Conn. Gen. Stat. § 46b-38b(b), which provides that "when complaints of family violence are made by two or more opposing persons," the police officer must "evaluate each complaint separately to determine which person is the dominant aggressor." Conn. Gen. Stat. § 46b-38b(b). In making this determination, officers are required to "consider the need to protect victims of domestic violence, whether one person acted in defense of self or a third person, the relative degree of any injury, any threats creating fear of physical injury, and any history of family violence between such persons, if such history can reasonably be obtained by the peace officer." *Id.* After considering these factors, the officer "shall arrest the person whom the officer believes to be the dominant aggressor." *Id.* But even if, as Stowe argues, Officer Gonzalez misapplied the statute, Stowe has provided no authority suggesting that failing to follow the prescriptions of the statute would negate the existence of probable cause to arrest the plaintiff. The test for a false arrest claim is whether the officer had probable cause to believe the plaintiff committed a crime, not whether the officer followed a statutorily prescribed procedure concerning arrests. In any event, the statute does not make the identity of the person who initiated the violence the primary determinant of "dominant aggressor" status.

Stowe also argues that Gonzalez failed to interview him, which he contends was required by Cheshire Police departmental policy, and that the warrant omitted his version of events. He further argues that Gonzalez omitted: that Schieferstein had no personal knowledge of the incident, "Officer Wells' doubts about the veracity of Schieferstein's statement, given the fact that she was friends with [Ashley] Wells and [Hayden] Beausoliel, who urged her to make the complaint," and "the fact that [Ashley] Wells had refused to provide a statement indicating that Stowe had been the dominant aggressor." ECF No. 38 at 10. According to Stowe, in light of Schieferstein's lack of personal knowledge, her "lack of credibility based on her connection with Beausoliel and [Ashley] Wells," and Wells's "admission that she had initiated the physical violence" by scratching him, "no reasonable magistrate would have concluded probable cause existed." ECF No. 38 at 14.

I disagree. Even when the evidence is viewed in the light most favorable to Stowe and with all permissible inferences drawn in his favor, probable cause remains under the "corrected affidavit." Based on the interviews with Schieferstein and Ashley Wells, Officer Gonzalez was informed that Stowe and Ashley Wells engaged in a physical altercation during which Stowe applied some amount of physical force toward Wells; even what Stowe said, according to Wells, when he returned to the house acknowledged that much. See ECF No. 38-10 at 24 ("I was just pushing you off of me because you were trying to get the phone from me. That's why you fell. That's why you got hurt.") Stowe does not point to any facts suggesting that Officer Gonzalez had reason to question Wells's veracity. And Schieferstein's statement was corroborated in part by the photos she took of bruises on Wells, as well as the history of physical and emotional abuse that Wells reported to Gonzalez. *See Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) ("When information is received from a putative victim or an eyewitness, probable cause exists ...

unless the circumstances raise doubt as to the person's veracity"). Although Wells declined to provide a written statement, she did not retract her allegation. Wells's and Schieferstein's statements provided Officer Gonzalez with probable cause to arrest Stowe for disorderly conduct at least. Under Connecticut law, "[a] person is guilty of disorderly conduct when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, such person: (1) Engages in fighting or in violent, tumultuous or threatening behavior; or (2) by offensive or disorderly conduct, annoys or interferes with another person ...." Conn. Gen. Stat. § 53a-182. And it is well settled that "[a] Fourth Amendment claim turns on whether probable cause existed to arrest for any crime, not whether probable cause existed with respect to each individual charge." *Marcavage v. City of New York*, 689 F.3d 98, 109 (2d Cir. 2012). "Accordingly, Defendants prevail on their motion if there was probable cause to arrest Plaintiff[] for any single offense." *Id. See Maroto v. Haddad*, 2025 WL 821040, at *4 (D. Conn. Mar. 14, 2025) (defendant officer had probable cause to arrest plaintiff for disorderly conduct where plaintiff pushed her daughter).

While Stowe makes much of the fact that he was not interviewed, none of the authorities he has cited compel a finding that this was required under the circumstances, much less a constitutional violation on the part of Officer Gonzalez.[4] "Once a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every

---

[4] Stowe cites excerpts from the Cheshire Police Department Criminal Investigations policy which states in pertinent part that
> Investigating officers will fairly and impartially investigate all cases assigned to them. They will contact victims and witnesses promptly upon receiving an investigation . . . . Officers conducting preliminary investigations are responsible for completing the following steps, when appropriate, based on the nature and circumstances of a particular complaint:
> . . .
> b. Identifying, locating, and interviewing all victims and witnesses relative to the complaint . . . .
> e. Interviewing the suspect(s), *if appropriate*.

ECF No. 38-15 (emphasis added). In any event, police department policies and operating procedures are usually not relevant to a determination of whether an officer has violated the Fourth Amendment. *See Whren v. United States*, 517 U.S. 806, 815-16 (1996).

theoretically plausible claim of innocence before making an arrest." *Ricciuti v. N.Y.C. Transit Authority,* 124 F.3d 123, 128 (2d Cir. 1997); *see also Rhodes v. United States,* 2012 WL 777336, at *10 (W.D.N.Y. Mar. 7, 2012) (federal officers not required to interview plaintiff who later asserted false arrest claim: "It is well-settled . . . that there is no duty imposed upon arresting officers to investigate exculpatory defenses offered by the person being arrested . . . ."). As for Stowe's point that Ashley Wells initiated the physical contact, that does not defeat probable cause to arrest him, even if there was also probable cause to arrest her. *See Marom v. Town of Greenburgh*, 722 F. App'x 32, 35 (2d Cir. 2018) (plaintiff's statement that he acted in self-defense, even supported by his wife's statement that the individual kicked him first, did not vitiate probable cause to arrest plaintiff). Because probable cause remains after correcting the warrant affidavit and adding the allegedly omitted information, no violation of the plaintiff's Fourth Amendment rights has occurred.

Even if the corrected warrant does not establish probable cause, Officer Gonzalez nonetheless had "arguable probable cause," which is enough to sustain her defense of qualified immunity and thus to warrant summary judgment. "Officers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of probable cause ... and in those situations courts will not hold that they have violated the Constitution.... Therefore, in situations where an officer may have reasonably but mistakenly concluded that probable cause existed, the officer is nonetheless entitled to qualified immunity." *Caldarola v. Calabrese*, 298 F.3d 156, 162 (2d Cir. 2002). "In the context of a false arrest claim, qualified immunity protects an officer if he had 'arguable probable cause' to arrest the plaintiff." *Myers v. Patterson*, 819 F.3d 625, 632 (2d Cir. 2016) (internal quotation marks and citation omitted). "Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b)

officers of reasonable competence could disagree on whether the probable cause test was met." *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (internal quotation marks and citation omitted). The Second Circuit has emphasized,

> When a plaintiff alleges that a law enforcement officer's official conduct renders him personally liable in damages, our inquiry is not whether the officer *should have* acted as he did. Nor is it whether a singular, hypothetical entity exemplifying the "reasonable officer"—a creature akin to the "reasonable man" of the law of torts ...—*would have* acted in the same way. It is instead whether *any* reasonable officer, out of the wide range of reasonable people who enforce the laws in this country, *could have* determined that [probable cause existed].

*Figueroa v. Mazza*, 825 F.3d 89, 100 (2d Cir. 2016). The defense of qualified immunity "aims to give officials room to act with confidence in gray areas by absolving from personal liability all but the plainly incompetent or those who knowingly violate the law." *Id.* at 99 (internal quotation marks and citation omitted).

Even when the evidence is viewed in the light most favorable to the plaintiff and with all permissible inferences drawn in his favor, Wells's and Schieferstein's statement gave Officer Gonzalez at least arguable probable cause to arrest Stowe, and therefore, she is entitled to summary judgment under the doctrine of qualified immunity.

### B. June 2022 Arrest

Stowe alleges that his June 3, 2022 arrest by Officer Flood for violating the protective order lacked probable cause because the protective order prohibited him from being at Wells's "home or residence," not his own. ECF No. 1 ¶ 38; ECF No. 38 at 16.

Defendants move for summary judgment on the grounds that even if Flood did not have probable cause to arrest Stowe, he is entitled to qualified immunity because arguable probable cause existed. I agree.

Wells, Stowe, and Stowe's grandmother all stated that Wells *stayed* at the Cornwall Avenue address, and Wells and Stowe told Officer Flood that Wells did so "often." ECF No. 32-15 at 2-3. The protective order was not limited to Wells's Colchester address but encompassed "wherever [she] shall reside." ECF No. 32-17. Although the record does not indicate exactly how "often" Wells slept at the Cornwall Avenue address, the officer was not required to calculate the number of nights she stayed there or to research legal definitions of "residence" in deciding whether there was probable cause to arrest. He had enough facts for at least "arguable probable cause" based on Wells's and Stowe's statements that she stayed over "often." Based on these undisputed facts, I cannot conclude that no reasonable police officer, "out of the wide range of reasonable people who enforce the laws in this country, could have determined" that no probable cause existed to arrest Stowe for violating the protective order because he was where Wells resided. *Figueroa*, 825 F.3d at 100. Accordingly, Flood is entitled to summary judgment on Stowe's false arrest claim.

## IV.    Conclusion

For the foregoing reasons, the defendants' motion for summary judgment as to Officers Gonzalez and Flood is GRANTED as to the § 1983 false arrest claims in counts 1 and 4. Because these claims are the only ones over which the Court has original jurisdiction, I decline to exercise supplemental jurisdiction over plaintiff's remaining state law claims, pursuant to 28 U.S.C. § 1367(c)(3), and therefore dismiss counts 2, 3, 5, and 6 without prejudice. The Clerk is directed to close this case.

IT IS SO ORDERED.

/s/
Michael P. Shea, U.S.D.J.

Dated: Hartford, Connecticut
August 28, 2025